**DEFENDERS OF WILDLIFE,**
**et al. Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. 00CV2996.**

United States District Court, District of Columbia.

Dec. 26, 2002.

Eric Glitzenstein, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Mauricia M.M. Baca, Trial Attorney, Jean Williams, Chief Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs, twelve conservation organizations committed to preserving animal and plant species in their natural habitats and one individual involved in Lynx conservation efforts,[1] challenge a final decision by the United States Fish and Wildlife Service ("FWS" or the "Service") declaring the Lynx in the contiguous United States to be a "threatened," rather than "endangered," species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* Plaintiffs allege that the designation of the Lynx as threatened is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law," in violation of § 706(2)(A) of the Administrative Procedure Act ("APA"), 5 U.S.C.

---

1. Plaintiffs are Defenders of Wildlife, Biodiversity Legal Foundation, Northwest Ecosystem Alliance, The Fund for Animals, Humane Society of the U.S., Kettle Range Conservation Group, Oregon Natural Resources Council, Predator Conservation Alliance, Restore: The North Woods, Superior Wilderness Action Network, American Lands Alliance, Conservation Action Project, and Mark Skatrud.

§ 706(2)(A). Plaintiffs also contend that the Service has violated the ESA by failing to designate "critical habitat" for the Lynx as required by that statute.

Defendants are Gale Norton, Secretary of the Interior, who has ultimate responsibility for implementing the ESA, and Steven Williams, Director of FWS, the agency that has been delegated the day-to-day responsibility for implementing the ESA.

The matter is now before the Court on cross-motions for summary judgment. Having considered the parties' motions, oppositions and replies thereto, as well as the Administrative Record in this case, and having heard the parties' oral arguments on November 13, 2002, for the reasons set forth below, the Court **grants** Plaintiffs' Motion for Summary Judgment and **denies** Defendants' Motion for Summary Judgment.

## I. STATUTORY FRAMEWORK

### A. Overview

The ESA is the " 'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). When Congress enacted the statute in 1973, it intended to bring about the "better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5). Having found that a number of species of fish, wildlife, and plants in the United States had become extinct "as a consequence of economic growth and development untempered by adequate concern and conservation," Congress intended the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species." *Id.* § 1531(a)(1), (b). In particular, the legislative history of the statute reflects a "consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status." *Southwest Ctr. for Biological Diversity v. Babbitt,* 926 F.Supp. 920, 924 (D.Ariz. 1996); *see* H.R.Rep. No. 412, 93d Cong., 1st Sess. 10 (1973), *reprinted in* 1978 U.S.C.C.A.N. 2989, 2998.

The Act imposes certain responsibilities on the Secretary of the Interior, and the Secretary of the Interior has in turn delegated day-to-day authority for implementation of the ESA to FWS, an entity within the Department of the Interior. 16 U.S.C. § 1531(b); 50 C.F.R. § 402.01(b). The ESA's protection of a species and its habitat is triggered only when FWS "lists" a species in danger of becoming extinct as either "endangered" or "threatened." 16 U.S.C. § 1533. The Act defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). FWS has issued a "Vertebrate Population Policy" delineating the circumstances under which the Service will list, as endangered or threatened, a "distinct population segment" or "DPS" of a species. 61 Fed.Reg. 4722.

A species is "endangered" when it is in "danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is defined as "threatened" when it is "likely to become an endangered species within the foreseeable future." *Id.* § 1532(20).

Endangered species are entitled to greater legal protection under the ESA than threatened species. For any species listed as endangered, the ESA makes it unlawful for any person to, among other activities, "import any such species into, or export any such species from the United States," or to "take any such species within the United States." *Id.* § 1538(a)(1)(A), (B). The term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). For species that are listed as threatened, rather than endangered, the Secretary of the Interior "may," but is not required to, extend these prohibitions on taking and export. *Id.* § 1533(d).

### B. Critical Habitat

When FWS lists a species, it is also required to "concurrently" designate "critical habitat" for the species, unless it determines that such habitat "is not then determinable." *Id.* § 1533(a)(6)(C). In that event, FWS "must publish a final regulation" designating critical habitat "to the maximum extent prudent" within one year following the final listing decision. *Id.*

Critical habitat is defined to include those specific areas which are presently "occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(I). Critical habitat may also include habitat that is unoccupied by the species at the time of the listing, if FWS determines that such areas are "essential for the conservation of the species." *Id.*

### C. Section 7 Consultation

Under Section 7(a)(2) of the ESA, after a species is listed as endangered or threatened, each federal agency that takes or authorizes an action that may affect a listed species must "insure," in "consultation" with the Service, that such action "is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [the species' designated critical] habitat." *Id.* § 1536(a)(2).

If the Service or federal agency determines that any contemplated agency action "may affect listed species or critical habitat," the agency and the Service must engage in "formal consultation." 50 C.F.R. § 402.14(a). Formal consultation is not required, however, if FWS issues a "written concurrence" that the proposed agency action "is not likely to adversely affect any listed species or critical habitat." *Id.* § (b); 16 U.S.C. § 1536.

The formal consultation process requires FWS to issue a Biological Opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). If the Service finds that the action under review will jeopardize the continued existence of the species or destroy or "adversely modify" the species' critical habitat, then the Service must set forth those "reasonable and prudent alternatives" which would avoid these results. *Id.*

## II. FACTUAL AND PROCEDURAL BACKGROUND [2]

### A. The Canada Lynx

The Canada Lynx, Felix lynx canadensis ("Lynx"), is a medium-sized cat comparable in size to a bobcat. Adult males average 22 pounds in weight and 33.5 inches in

---

**2.** For purposes of these motions, the Court relies on those facts contained in the exten- sive Administrative Record and on the parties' Statements of Material Facts Not in Dispute.

length, and adult females average 19 pounds and 32 inches. The Lynx is distinguished from other cats of similar size, such as the bobcat, by its long legs and large paws which make it particularly well-adapted for hunting in deep snow. *See* Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule, 65 Fed.Reg. 16052 ("Lynx Final Rule" or "Final Rule"). In contrast to the bobcat, coyote, and other predators, which consume a variety of different kinds of animals, the Lynx is a "specialized carnivore" that depends heavily on one particular prey——the snowshoe hare. *Id.*

The North American range of the Lynx currently extends from Alaska, through Canada, and into the northern part of the contiguous United States. *Id.* In Canada and Alaska, Lynx inhabit the classic boreal forest ecosystem known as the taiga, whereas in the contiguous United States, the distribution of the Lynx is associated with the southern boreal forest, comprised of subalpine coniferous forest in the West and primarily mixed coniferous/deciduous forest in the East. *Id.*

In the lower forty-eight states, the Lynx range extends into four different regions that are separated from each other by ecological barriers consisting of unsuitable Lynx habitat. These regions are (1) the Northeast, (2) the Great Lakes, (3) the Southern Rocky Mountains, and (4) the Northern Rocky Mountains/Cascades. *Id.*

at 16054. There is evidence that the Lynx may currently be extirpated from New Hampshire, Vermont and New York in the Northeast region, and from Colorado and southeastern Wyoming in the Southern Rockies region. The largest presence of Lynx population in the contiguous United States is in the Northern Rocky Mountains/Cascades region. *Id.* at 16055–59.

**B. The Lynx's Listing History**

The Lynx has been the subject of either administrative action or judicial proceedings for the last ten years. In 1982, FWS formally identified the Lynx as a potential "candidate" for ESA listing. During the next ten years, however, the Service "took no formal steps to make a decision on listing." *Defenders of Wildlife v. Babbitt,* 958 F.Supp. 670, 674–75 (D.D.C.1997) ("*Lynx I*"). In response, conservation groups, including some of the Plaintiffs in the instant case, filed formal petitions with FWS, requesting that the agency list the Lynx in the contiguous U.S. *Id.*

**1. FWS's "Not Warranted" Finding**

In 1994, Region 6 of FWS——which comprises a significant portion of the Lynx's historic range, including Colorado, Montana, North Dakota, Utah, and Wyoming——prepared a "90–day finding" regarding one of the petitions for listing.[3] It determined that all five of the criteria for listing a species as endangered under the ESA were applicable to the Lynx.[4] *Id.* at 674.

3. Section 1533(b)(3)(A) of the ESA provides that, "within 90 days after receiving the petition of an interested person ... to add a species to, or to remove a species from, either [the endangered or threatened species list], the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A).

4. A species is determined to be endangered or threatened based on the following five factors: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1)(A)-(E).

That finding triggered the Service's obligation to conduct a comprehensive "review of the status of the species concerned," which included the Service's solicitation of "comments and relevant data from the public as well as from independent Lynx experts as to whether the Lynx should be listed." *Id.* at 676; 16 U.S.C. § 1533(a)(3)(A).

FWS's biologists in Region 6 also conducted their own review of the available scientific and commercial information. They concluded that " 'Lynx populations in the contiguous United States have suffered significant declines due to trapping and hunting and habitat loss,' and that at least four of the five statutory criteria for listing a species under the ESA apply to lynx." *Lynx I,* 958 F.Supp. at 676 (quoting 1st A.R. Doc. 35 at 19–43). The biologists drafted a proposal to list one segment of the Lynx population, in the Northwest and Northern Rockies, as threatened, and a second population, in the Northeast, Great Lakes, and Southern Rockies, as endangered. This recommendation was accompanied by an extensive, 50–page analysis of the Lynx's history and current status. *See id.* at 676.

Biologists from both Region 5 and Region 3, which encompass the Northeast and Great Lakes areas, respectively, supported the proposed rule. Only the Director of Region 1, which encompasses the Pacific Northwest, opposed it. *Id.* Although not every comment from the public indicated complete agreement with the 50–page report, not a single biologist or Lynx expert employed by FWS disagreed with the recommendation of the Region 6 biologists that the Lynx be listed. *Id.*

On October 20, 1994, Region 6 submitted its listing proposal to the Acting Director of FWS in Washington, D.C. for approval. *Id.* Two weeks later, the Acting Director rejected Region 6's proposal in a five-page memorandum which summarily concluded that the "listing of the Lynx in the 48 contiguous States is not warranted." *Id.*

The *Lynx I* plaintiffs subsequently challenged that finding, and, on March 27, 1997, the Court granted their motion for summary judgment. In so doing, the Court rejected various rationales advanced by the Service for not listing the Lynx. First, the Court rejected FWS's position that the ESA requires, prior to listing, "conclusive evidence of the biological vulnerability or real threats to the species in the contiguous 48 states." *Id.* at 679 (quotation omitted). Second, the Court rejected the Service's argument that Lynx need not be protected in the contiguous U.S. because they "remain[ ] plentiful in Canada and Alaska." *Id.* at 684 (quotation omitted). Third, the Court rejected specific factual assertions made by the Service as contrary to the "undisputed facts in the Administrative Record." *Id.* at 681.

## 2. FWS's "Warranted But Precluded" Finding

In response to the Court's ruling in *Lynx I,* FWS assembled an inter-regional team of field biologists that was "assigned to review the existing administrative record, incorporate any new (and relevant) scientific or commercial data that [had] become available since the Service's 1994 ["not warranted"] finding, and develop a new finding." Pl.Ex. A. Based on this new review, the Service's biologists again concluded that Lynx had been eliminated from most of their historic range in the U.S. *Id.* at 21–22.

On May 27, 1997, FWS published a "12–month finding" on the petition to list the Lynx. It determined that the Lynx warranted listing based on four of the five ESA statutory listing factors. 62 Fed. Reg. 28653–57.

Despite these findings, FWS refused to initiate a rulemaking process, asserting instead that the "immediate" issuance of a proposed rule was "warranted but precluded" by the Service's need to work on other species of even "higher priority" than the Lynx, and that the Service would proceed with the listing at some unspecified time in the future. *Id.* at 28657.

In September 1997, the conservation groups filed another lawsuit in this Court, challenging the Service's "warranted but precluded" determination. *See Defenders of Wildlife, et al. v. Babbitt, et al,* No. 1:97CV02122 (GK) ("*Lynx II*"). Three months later, the Court issued an Order stating that "[d]efendants' own 12–month finding makes clear" that "total extinction of the Lynx population is a distinct possibility," and that "the government's failure to have even raised the possibility of a preclusion finding——with its concomitant substantial delay——is very troubling and raises serious questions about the degree to which the Government has been fully candid and forthcoming with the Court." *Lynx II,* December 22, 1997 Order at 2, 3.

Subsequently, the government entered into a Court-ordered stipulation, which had been reached by the parties, requiring FWS to publish in the Federal Register a proposed rule to list the Lynx within the contiguous U.S. *Id.,* February 12, 1998 Settlement and Stipulation of Dismissal at 3.

### 3. Lynx Proposed Rule

On July 8, 1998, FWS published a proposed rule to list as "threatened" the "contiguous U.S. distinct population segment of the Canada Lynx." 63 Fed.Reg. 36994. It determined that this population is in jeopardy from "human alteration of forests, low numbers as a result of past over exploitation, expansion of the range of competitors . . . and elevated levels of human access into lynx habitat." *Id.*

In finding that the U.S. population should be listed, the Service found that

[b]ased on historic observations, trapping records and other evidence available to the Service at this time, the Service finds that, historically, Canada lynx were resident in 16 of the contiguous United States. The overall numbers and range of Canada lynx in the contiguous United States are substantially reduced from historic levels. Currently, resident populations of lynx likely exist in Maine, Montana, Washington, and possibly Minnesota. States with recent records of individual lynx sightings, but possibly no longer sustaining self-supporting populations, include Wisconsin, Michigan, Oregon, Idaho, Wyoming, Utah, and Colorado. Lynx may be extirpated from New Hampshire, Vermont, New York, Pennsylvania, and Massachusetts.

*Id.* at 37007.

FWS did not propose the designation of any "critical habitat" for Lynx, despite the ESA's requirement that such habitat be designated "to the maximum extent prudent and determinable" at the time of listing. 16 U.S.C. § 1533(a)(3)(A). Instead, the Service stated that it was not "prudent" to designate critical habitat because "from a section 7 consultation perspective, no additional conservation benefit would be achieved" by the designation, and because the designation would "increase the vulnerability of lynx to poaching." 63 Fed. Reg. at 37009.

### 4. Lynx Final Rule

On March 24, 2000, the Service published its Lynx Final Rule, listing as "threatened" the contiguous U.S. DPS of the Lynx. Lynx Final Rule, 65 Fed.Reg. 16052. In so doing, the Service declared that

"[c]ollectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS," and "do[ ] not contribute substantially to the persistence of the contiguous United States DPS." *Id.* at 16066–67.

With respect to the designation of critical habitat, the Service changed its position and determined that a critical habitat designation for the Lynx is "prudent." *Id.* at 16083. Nonetheless, it did not propose a designation of such habitat, and instead, announced that "[d]eferral of the critical habitat designation for Canada lynx allows us to concentrate our limited resources on higher priority critical habitat," and that "[w]e will develop a proposal to designate critical habitat for the Canada lynx as soon as feasible, considering our workplace priorities." *Id.* at 16083.

On December 14, 2000, Plaintiffs brought this lawsuit ("*Lynx III*") challenging the Service's Final Rule listing the Lynx as threatened, rather than endangered, and its failure to designate the species' critical habitat, as required by the ESA.

### III. STANDARD OF REVIEW

■ This case is brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and under the APA, 5 U.S.C. § 706(2)(A). Under the APA's deferential standard of judicial review, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A). The court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court's review of an agency's decision is limited to the administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct.

1241, 36 L.Ed.2d 106 (1973). The court's limited role is to ensure that the agency's decision is based on relevant factors and not a "clear error of judgment." *Id.* If the "agency's reasons and policy choices ... conform to 'certain minimal standards of rationality' ... the rule is reasonable and must be upheld." *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted).

■ In exercising its narrowly defined review authority under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814; *Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1220 (D.C.Cir.1983).

■■ The deference a court must accord an agency's decision-making is not unlimited, however. For example, the presumption of agency expertise may be rebutted if its decisions are not reasoned. *ALLTEL Corp. v. FCC,* 838 F.2d 551, 562 (D.C.Cir.1988). Where an agency fails to articulate "a rational connection between the facts found and the choice made," *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, et al.,* 462 U.S. 87, 88, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), the Court " 'may not supply a reasoned basis for the agency's action that the agency itself has not given.' " *Dithiocarbamate Task Force v. EPA,* 98 F.3d 1394, 1401 (D.C.Cir.1996) (quoting *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). If an agency fails to articulate a rational

basis for its decision, it is appropriate for a court to remand for reasoned decision-making. *See, e.g., Carlton v. Babbitt,* 900 F.Supp. 526, 533 (D.D.C.1995) (remanding FWS's 12–month finding that the grizzly bear should not be reclassified because the FWS "failed to sufficiently explain how it exercised its discretion with respect to certain of the statutory listing factors").

## IV. ANALYSIS

As noted above, Plaintiffs contend that, by listing the Lynx in the contiguous United States as threatened, rather than endangered, Defendants acted arbitrarily, capriciously, and contrary to law, in violation of the ESA and APA. Specifically, Plaintiffs argue that FWS acted arbitrarily and capriciously when it determined in the Lynx Final Rule that "[c]ollectively, the Northeast, Great Lakes and Southern Rockies do not constitute a significant portion of the range of the DPS." Lynx Final Rule, 65 Fed.Reg. at 16061.[5] Plaintiffs further maintain that Defendants violated the ESA by failing to designate Lynx critical habitat, as required by that statute. Plaintiffs seek a number of remedies for this violation, including injunctive and declaratory relief.

### A. FWS's Determination That, Collectively, Three of the Four Lynx Populations Do Not Constitute a Significant Portion of the Range of the DPS in the United States Is Arbitrary, Capricious, and Contrary to the ESA

██ Under the ESA, a species is endangered when it is in "danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Plaintiffs contend that the Service's determination that "[c]ollectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS," was critical to its refusal to list the Lynx as endangered. Lynx Final Rule, 65 Fed.Reg. at 16061. They maintain that, if those three regions are considered collectively to be a significant portion of the U.S. DPS, "then the Lynx's highly imperilled status · in *those* three areas would necessitate listing of the entire DPS as endangered." Pls. Mot. for Summ. J. at 30 (emphasis in original) ("Pls.Memo.").

As noted above, FWS has determined that the Lynx range extends into four separate regions—Northeast, Great Lakes, Southern Rocky Mountains, and Northern Rocky Mountains/Cascades. Lynx Final Rule, 65 Fed.Reg. at 16054. In the Lynx Final Rule, the Service itself acknowledged the imperilled status of the Lynx in at least two of its historical regions. With respect to the Northeast region, FWS found that "the lynx is extirpated from New York;" that although "Lynx historically occurred in New Hampshire, ... recent records of lynx occurrence in New Hampshire are rare;" and that "the State of Vermont currently considers lynx to be extirpated." *Id.* at 16055–56. Similarly, with respect to the Southern Rockies region, the Service found that "a resident lynx population historically occurred ... in both Colorado and southeastern Wyoming ... [and that] [t]his resident population

---

**5.** Plaintiffs also argue that FWS acted arbitrarily and capriciously when it (1) failed to treat the four Lynx regions as separate DPS's, and (2) determined that the "lack of guidance for conservation of lynx in National Forest Land and Resource Plans and BLM Land Use Plans" is the single factor threatening the contiguous U.S. DPS of Lynx. Lynx Final Rule, 65 Fed.Reg. at 16082. Because the Court concludes that Defendants violated the ESA and APA by determining that collectively, three of the four Lynx populations do not constitute a significant portion of the range of the U.S. DPS, the Court need not address these additional arguments.

may now be extirpated." *Id.* at 16059. Because the Service's data is less clear with respect to the Great Lakes region, it could not "determine whether resident lynx populations occur currently or historically in the Great Lakes Region." *Id.* at 16057. Despite the limited available data, the Final Rule makes it clear that, if any resident Lynx population does exist in the Great Lakes region, it is rare. Indeed, the Final Rule specifically concludes that, compared to these other three regions, the "Northern Rockies/Cascades Region supports the largest amount of lynx habitat and has the strongest evidence of persistent occurrence of resident lynx populations." *Id.* at 16061.

FWS's conclusion that these three, of the Lynx's four regions, are collectively not a significant portion of its range is counterintuitive and contrary to the plain meaning of the ESA phrase "significant portion of its range." While the ESA does not define this important phrase, the word "significant" is defined in the dictionary as "a noticeably or measurably large amount." Webster's Ninth Collegiate Dictionary at 1096 (Merriam–Webster Inc. 1990). It is difficult to discern the logic in the Service's conclusion that three large geographical areas, which comprise three-quarters of the Lynx's historical regions, are not a "noticeably or measurably large amount" of the species' range. At a minimum, the Service must explain such an interpretation that appears to conflict with the plain meaning of the phrase "significant portion."

Moreover, the Service's focus on only one region of the Lynx's population——the Northern Rockies/Cascades—to the exclusion of the remaining three-quarters of the Lynx's historical regions, is antithetical to the ESA's broad purpose to protect endangered and threatened species. 16 U.S.C. § 1531(b). Indeed, when Congress enact-

ed the ESA in 1973, it expressly extended protection to a species endangered in only a "significant portion of its range." The two earlier statutes enacted to protect and preserve endangered species narrowly defined endangered species as including only those species facing total extinction. *See* Endangered Species Conservation Act, Pub.L. 81–135 § 3(a), 83 Stat. 275 (Dec. 5, 1969) (describing endangered species as those threatened by "worldwide extinction"); Endangered Species Preservation Act, Pub.L. 89–669 § 1(c), 80 Stat. 926 (Oct. 15, 1966) (describing an endangered species as one whose "existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of over exploitation, disease, predation, or because of other facts, and that its survival requires assistance"). Thus, FWS's exclusive focus on one region where the Lynx is more prevalent, despite its historic presence in three additional regions, is contrary to the expansive protection intended by the ESA.

FWS justifies its determination that the Northeast, Great Lakes, and Southern Rockies regions do not constitute a significant portion of the Lynx range by arguing that Lynx are naturally rare in the contiguous U.S., particularly in those three regions. This argument that a species is not "significant" under the ESA because it is naturally rare, has no foundation in the statute, and is, again, contrary to the ESA's broad purpose to protect wildlife that is "in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). Indeed, FWS fails to cite any language in the text of the ESA or its legislative history to suggest that Congress did not intend to afford rare species all the protections of the ESA. The Service's reasoning "would allow the *most* fragile, at-risk species to receive the *least* protection under the law." Pls. Memo. at 34 (emphasis in original). Such a consequence flies in the face of the

plain language of the ESA and its purpose.[6]

In *Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir.2001), the Ninth Circuit was faced with a similar question about the meaning of the ESA phrase "significant portion of its range." The plaintiffs in that case appealed a district court decision upholding a decision of the Secretary of the Interior to withdraw a proposed rule to list the flat-tailed horned lizard as a threatened species under the ESA. The Ninth Circuit reversed the district court's ruling, holding that the Secretary's decision to withdraw the rule was arbitrary and capricious.

In a comprehensive opinion examining the phrase "significant portion of its range" and the ESA's legislative history, the Court of Appeals concluded that a species could be "extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." *Id.* at 1145. Applying this standard to the record in

this case, it is clear that FWS's determination that, collectively, three of the four Lynx populations do not constitute a significant portion of its range is erroneous or, at a minimum, inadequately reasoned.[7] As noted earlier, FWS itself has acknowledged that Lynx historically occurred in at least two of these regions——the Northeast and Southern Rockies——and may now be extirpated from these areas. *See* Lynx Final Rule, 65 Fed.Reg. at 16055–56, 16059 (finding that in the Northeast "lynx are not thought to occur in Vermont," "the lynx is extirpated from New York," and "recent records of lynx occurrence in New Hampshire are rare;" and finding that in the Southern Rockies "a resident lynx population historically occurred in the Southern Rockies Region in both Colorado and southeastern Wyoming . . . [but that] [t]his resident population may now be extirpated").[8] Accordingly, the Service's own Final Rule makes clear that "there are major geographical areas in which [the Lynx] is no longer viable but once was." *Defenders of Wildlife*, 258 F.3d at 1145.[9]

**6.** The Court recognizes that there was disagreement among FWS's biologists concerning whether the Lynx should be listed as endangered, threatened, or not at all. Because the Court's conclusion is based on the Service's misinterpretation of the ESA, not on the merits of the biologists' differing views, it need not address that disagreement.

**7.** The Service's conclusion in the Ninth Circuit case is similar to its conclusion here. In both cases, FWS presented a crabbed interpretation of the phrase "significant portion of its range," which would mean that a species that had once survived in a region, but no longer did, was not entitled to the protections of the ESA.

**8.** During the motions hearing, counsel for Defendants also conceded that there was historically a population, albeit small, of Lynx in the Northeast and Southern Rockies regions.

**9.** In addition, the logical consequence of the analysis presented by the Service is a disproportionate focus on public lands. This em-

phasis on public lands, at the expense of private lands, was rejected by the Ninth Circuit. In that case, FWS argued that, even if the flat-tailed horned lizard was imperilled on "private land habitat," it did not warrant listing "[b]ecause of the large amount of lizard habitat located on public lands within the United States and the reduction of threats on these lands due to changing land-use patterns and conservation efforts of public agencies." *Defenders of Wildlife*, 258 F.3d at 1141.

In this case, seventy-two percent of the Northern Rockies and ninety-nine percent of the Cascades region——which FWS determined is "the primary region necessary to support the continued long-term existence of the contiguous United States DPS"——is comprised of federal lands. Lynx Final Rule, 65 Fed.Reg. at 16061, 16082. In contrast, the Service itself acknowledged that the overwhelming majority of the regions it determined not to be significant are comprised of non-federal lands. *Id.* at 16081 (finding that federal lands comprise 82 percent of the

In summary, the Court concludes that FWS's determination that "[c]ollectively, the Northeast, Great Lakes, and Southern Rockies do not constitute a significant portion of the range of the DPS," is arbitrary, capricious, and contrary to the ESA and its sweeping purpose.[10] Consequently, FWS's determination must be set aside, and the case is remanded for reconsideration and explanation, consistent with the Court's ruling. Given the Service's own acknowledgment that there are at least two regions——the Northeast and Southern Rockies——in which the Lynx is no longer viable but once was, the Service must, at a minimum, "explain [its] conclusion that the

area in which the [Lynx] can no longer live is not a 'significant portion of its range.' " *Id.* In so doing, the Service may not rely on the Lynx's perceived natural rarity, since such reliance is antithetical to the ESA's purpose.

## B. FWS's Failure to Designate Lynx Critical Habitat Violates the ESA

As addressed above, the ESA requires that a critical habitat designation "shall be published concurrently" with a listing determination, unless FWS determines that such a designation is "not then determinable." 16 U.S.C. § 1533(b)(6)(C). It is undisputed that the Service has not desig-

Southern Rockies region, 19 percent of the Great Lakes region, and only 7 percent of the Northeast region). Just as the Service in the Ninth Circuit case could not neglect the lizard's status on private land, if that region constituted a significant portion of the species' range, neither can the Service do so in this case.

10. Because the Court concludes that FWS misinterpreted ESA's statutory scheme, it "owes the Secretary's interpretation no deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Defenders of Wildlife*, 258 F.3d at 1146 n. 11; *see International Longshoremen's Ass'n, AFL–CIO v. National Mediation Bd.*, 870 F.2d 733, 736 (D.C.Cir.1989) (finding that deference "is not due when the [agency] has apparently failed to apply an important term of its governing statute").

Further, in light of the Court's rejection of Defendants' statutory interpretation, it need not address the troubling fact that the Administrative Record in this case is not complete and has been seriously compromised. Defendants concede that e-mail messages concerning the Lynx listing were erroneously deleted and are therefore not included in the Administrative Record. These messages were sent to or from the FWS biologist who wrote the Lynx Final Rule. The e-mails were sent from July 1999 to early December 1999—the critical six-month period preceding publication of the Final Rule. Defs. Ex. E. Further, it is undisputed that the biologist whose e-mails

were lost, used e-mail for a substantial amount of her listing work. Thus, in light of the timing and author of the e-mails, it is likely that the documents missing from the Administrative Record would be significant.

The Court is further concerned by the fact that, only after FWS informed Plaintiffs that the Administrative Record was incomplete, did it provide Plaintiffs with twelve e-mails that it had previously withheld as protected by the deliberative process privilege. The Service's failure to provide these documents that should have been included in the original Administrative Record raises further doubts that it has provided the complete Administrative Record. Given the deficiency of the Administrative Record, it is questionable whether the Court would be in a position to adequately address the Service's conclusions under the APA. *See Boswell Memorial Hospital v. Heckler, et al.*, 749 F.2d 788, 793 (D.C.Cir.1984) (holding that, under the APA, "[r]eview is to be based on the *full* administrative record that was before the Secretary *at the time* [s]he made h[er] decision. To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record.' ... For review to go forward on a partial record, we would have to be convinced that the selection of particular portions of the record was the result of mutual agreement between the parties after both sides had fully reviewed the complete record.") (emphasis in original) (citations omitted).

nated critical habitat for the Lynx, nor has it made a "not ... determinable" finding. Indeed, the Service itself flatly "concedes that it has not designated critical habitat for the lynx within the time frame specified under [the] ESA and, thus, has failed to perform a nondiscretionary duty under 16 U.S.C. § 1533(b)(6)." Defs. Mot. for Summ. J. at 29–30 ("Defs.Memo."). *See Forest Guardians v. Babbitt,* 174 F.3d 1178, 1181, 1184 (10th Cir.1999) (holding that the obligation to designate critical habitat for a listed species is a "mandatory, non-discretionary duty unambiguously imposed by the ESA").

Not only is the Service in patent violation of an unequivocal statutory mandate, but it has asserted that, as a consequence of critical habitat spending subcaps imposed by Congress and its existing obligations to designate critical habitat for other species, it will not begin designating critical habitat for the Lynx until fiscal year 1995. Accordingly, the Service anticipates that it will submit a proposed critical habitat designation by November 1, 2005, and a final critical habitat designation one year later. Consequently, by FWS's own calculations, it will be over six and one-half years overdue in complying with its nondiscretionary duty to designate Lynx critical habitat. Such excessive delay runs completely counter to the mandate of the ESA which is to conserve "the ecosystems upon which endangered species and threatened species depend ... [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

**1. Injunctive Relief**

 The most significant remedy Plaintiffs seek for the Service's failure to perform its nondiscretionary duty, is injunctive relief. Specifically, Plaintiffs request that the Court enjoin the Service from concurring in any ESA Section 7 "may affect, not likely to adversely affect" determinations by other federal agencies until FWS completes the Lynx critical habitat designation required by the statute.

As explained above, under Section 7(a)(2) of the ESA, each federal agency that takes or authorizes an action that may affect an endangered or threatened species or its critical habitat must engage in "formal consultation" with FWS. The formal consultation process requires FWS to issue a Biological Opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). This formal consultation and evaluation process is not required, however, if FWS issues a "written concurrence" that the proposed agency action "is not likely to adversely affect any listed species or critical habitat." 50 C.F.R. § 402.14(a), (b); 16 U.S.C. § 1536. Plaintiffs seek to preclude the Service from issuing these concurrences.

Significantly, Plaintiffs' requested relief would not preclude federally approved agency actions from proceeding in Lynx habitat; instead it would require formal consultation, in conjunction with issuance of a Biological Opinion, prior to the taking of any agency action that might affect the species or its critical habitat. Defendants contend that this injunctive relief is not authorized by the ESA and is, in fact, precluded by the statute.

Although this appears to be a novel legal issue where no case law yet addresses the authority of the courts to award the type of injunctive relief requested, it is well-settled that when "Congress [has] intended to create a right of action ... [courts have] the availability of all appropriate remedies unless Congress has *expressly* indicated otherwise." *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 66, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)

(emphasis added); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (" '[T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.' ") (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)).

Defendants argue that the citizen suit provision of the ESA, under which Plaintiffs have brought this case, expressly limits the Court's authority to only one remedy——namely, "to order the Secretary to perform" her nondiscretionary duty. 16 U.S.C. § 1540(g)(1)(C).

However, Section 1540(g)(1)(C) is not the only remedy provided by Congress. The citizen suit provision of the ESA expressly reserves the traditional common law authority of the district courts to craft appropriate injunctive and equitable relief. Specifically, the citizen suit provision provides that

> [t]he injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).

*Id.* § 1540(g)(5).[11] Accordingly, not only did Congress not intend to limit the remedies available under the citizen suit provision, but it expressly reserved the courts' traditional equitable authority.

Moreover, Defendants fail to cite any language in the legislative history of the ESA to suggest that Congress intended to limit courts' authority to remedy the Service's violation of its nondiscretionary duties. Indeed, in 1982 Congress amended the ESA to authorize suits against the Secretary of the Interior for failure to perform these duties, precisely because FWS was not "making efficient and speedy progress in the process of listing" and conserving the species the ESA was enacted to protect. S.Rep. No. 418, 97th Cong.2d Sess. 14 (1982). Congress determined that, as a consequence of the amendment, "[u]nlike the situation under current law, the Secretary cannot simply refuse to act. [S]he must make decisions within specified periods of time and [s]he will be accountable for failure to make timely and defensible decisions." *Id.* at 14, 15. In this case, FWS has done precisely what frustrated Congress twenty years ago; it has "simply refuse[d] to act." Limiting the Court's authority to craft appropriate injunctive relief in the face of this prolonged failure to comply with a nondiscretionary duty would be directly contrary to the clearly expressed intent of Congress.

Not only does the Court have the authority to award the injunctive relief Plaintiffs request, but granting this relief is essential to fully and effectively carry out the will of Congress. As addressed above, by failing to designate Lynx critical habitat at the time of the Lynx's "threatened" listing, FWS is in patent violation of an unequivocal statutory mandate. Moreover, the Service has asserted that it is unable to remedy this violation for an additional four years, six and one-half years after it was required by the ESA to do so.

---

**11.** Significantly, Defendants did not address this provision either in their briefs or during the motions hearing.

Therefore, absent the injunctive relief Plaintiffs seek, they will be without any meaningful remedy for the Service's failure to comply with its nondiscretionary duty, and Defendants will not be held accountable for that failure. Most significantly, the Lynx, which the ESA was designed to protect, would continue to suffer the adverse effects of the Service's failure to protect its habitat. Without the designation of its critical habitat, and the protections which flow from such designation, the Lynx would be vulnerable to further extirpation and "destruction or adverse modification of [its] habitat." 16 U.S.C. § 1536(a)(2). Plaintiffs' requested relief would, in part, ameliorate these negative consequences for the species.[12]

Defendants maintain that the Section 7 consultation process adequately protects the Lynx in the absence of critical habitat designation.[13] This contention is directly contrary to the plain language of the ESA and Congress's statutory mandate, which requires federal agencies to ensure that their actions are not "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." 16 U.S.C. § 1536(a)(2).

Indeed, Congress itself emphasized the importance of critical habitat in the consultation process:

classifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or greater importance is the determination of the habitat necessary to that species' continued existence. Once a habitat is so designated the Act requires that proposed Federal actions not adversely affect the habitat.

H.R.Rep. No. 887, 94th Cong., 2d Sess. 3 (1976).

In *Sierra Club v. U.S. Fish and Wildlife Service,* 245 F.3d 434 (5th Cir.2001), the Fifth Circuit also recognized the significance of critical habitat designation. *Id.* at 439 ("Critical habitat designation primarily benefits listed species through the ESA's consultation mechanism. If critical habitat has been designated, the statute imposes an additional consultation requirement where an action will result in the 'destruction or adverse modification' of critical habitat."). Indeed, the ESA's stated purpose is, in part, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be preserved." 16 U.S.C. § 1531(b). Thus, the Lynx cannot, by definition, receive the full extent of protection provided by the ESA and the Section 7 consultation process until its critical habitat is designated.

---

**12.** As addressed above, federal agencies will still be permitted to take or authorize an action that affects the Lynx habitat. However, prior to doing so, the species would receive the protection of the formal consultation process, including the preparation of a Biological Opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). Moreover, if the Service concludes that the action under review will jeopardize the continued existence of the species or destroy or "adversely modify" its critical habitat, the Biological Opinion must outline any "reasonable and prudent alternatives" that the Service believes will avoid that consequence. *Id.*

**13.** Defendants argue that the Lynx Conservation Assessment and Strategy ("LCAS") serves to protect the Lynx without critical habitat designation. Defendants acknowledge, however, that the LCAS is designed to "guide management on Federal lands across the range of lynx." Vandehey Decl. ¶ 2. Thus, by definition, the LCAS only identifies and protects Lynx habitat on Federal lands, and does not protect its habitat on non-Federal land which, as noted above, comprise ninety-three percent and eighty-one percent of the Northeast and Great Lakes regions, respectively. 65 Fed.Reg. at 16081.

In summary, FWS must be enjoined from concurring in any ESA Section 7 "may affect, not likely to adversely affect" determinations by other federal agencies until it completes the Lynx critical habitat designation required by the ESA, in order to carry out Congress' mandate to conserve endangered and threatened species and their habitat. Congress did not limit district courts' authority to provide equitable relief under the ESA, and, indeed, specifically reserved their traditional authority to fashion this appropriate equitable relief. In this case, the limited injunctive relief being granted is narrowly tailored to the conceded violation of a nondiscretionary statutory duty, and is absolutely necessary because the Service refuses, for the next four years, to provide the Lynx with the protection to which it is entitled under the ESA.

### 2. Additional Relief

■ In addition to injunctive relief, Plaintiffs seek the following additional relief: (1) declaratory relief; (2) an Order directing Defendants to undertake "prompt" critical habitat rulemaking; (3) the Court's retention of jurisdiction until completion of the rulemaking process; and (4) an Order directing Defendants to submit status reports to the Court every sixty days.

First, Plaintiffs seek a Declaratory Judgment that, by "failing to comply with their non-discretionary duty to designate critical habitat for the Lynx, [D]efendants have undermined the purpose and function of the consultation process set forth in section 7(a)(2) of the ESA[ ], and precluded the [FWS] from issuing Biological Opinions which satisfy the standards of that provision of the statute." Pls. Memo. in Opp'n to Defs. Motion for Summ. J. and Reply in Support of Pls.' Mot for Summ. J. at 17 ("Pls.Opp'n"). As discussed above, the importance of critical habitat in the Section 7 consultation process has been emphasized both by Congress and by the courts. *See* H.R.Rep. No. 887, 94th Cong., 2d Sess. 3 (1976); *Sierra Club,* 245 F.3d at 439. Accordingly, it is clear that, by failing to comply with this mandatory, nondiscretionary duty unambiguously imposed by the ESA, FWS has undermined the purpose and function of the Section 7 consultation process, and entry of a Declaratory Judgment is justified and appropriate.

■ Second, Defendants do not, in principle, contest Plaintiffs' request for prompt critical habitat rulemaking, retention of jurisdiction until completion of that rulemaking, and submission of status reports every sixty days. These remedies have been ordered by other courts for agencies' violations of mandatory obligations. *See In Re Bluewater Network,* 234 F.3d 1305, 1316 (D.C.Cir.2000) (ordering "prompt ... rulemaking" and retaining jurisdiction); *Forest Guardians,* 174 F.3d at 1193 ("order[ing] the Secretary to issue a final critical habitat designation ... as soon as possible").

Defendants' principal objection is that, while they do not oppose an order directing prompt critical habitat designation, any "order to designate critical habitat [should] not take effect until the listing decision of the Canada lynx is a final rule not subject to appeal." Defs. Memo. at 34. It appears that Defendants are arguing that they should not be required to designate critical habitat until after the Service has fully addressed the issue remanded by the Court, and that determination on remand has made its way through the judicial review process. In other words, as a practical matter, Defendants wish to delay commencement——to say nothing of completion——of the critical habitat rulemaking process for at least one to two years.

Defendants' argument is contrary to the plain language of the ESA. Even though a final listing rule is always subject to judicial review, the ESA does not provide an exception to critical habitat designation where a listing decision may be challenged in court. Instead, Congress clearly specified that the critical habitat designation shall be made "concurrent" with the listing rule. 16 U.S.C. § 1533(a)(6)(C).

Moreover, even without the delay Defendants seek, they agree that the final rulemaking will not be concluded for four years. The Lynx should not be deprived of the protection it is afforded under the ESA for this additional period of time. Indeed, because the Court has concluded that the Lynx Final Rule fails to afford the species the protection to which it is entitled, and which is necessary to avoid its extinction, it would "simply add insult to injury to compound that problem by *also* delaying indefinitely the legally mandated benefits conferred by critical habitat designation." Pls. Opp'n at 14.[14]

In summary, the Court concludes that Plaintiffs' requested declaratory relief is justified, appropriate, and necessary. Further, Defendants are directed to undertake prompt rulemaking in order to designate Lynx critical habitat and to submit reports on the status of that designation every sixty days. Finally, the Court shall retain jurisdiction of this case until completion of the designation.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **denied**, and Plaintiffs' Motion for Summary Judg-

ment is **granted**. An Order will issue with this Opinion.

---

**14.** The dates relied upon by the Court—namely, November 1, 2005 for a proposed rule and November 1, 2006 for a final rule—are those dates on which the Service has indicated it will be able to complete the listing, in light of its financial constraints and the complexity of the critical habitat designation.