**COOK INLET BELUGA WHALE, et al., Plaintiffs,**

v.

**William M. DALEY, Secretary, U.S. Department of Commerce, et al., Defendants,**

**City of Anchorage, et al., Intervener–Defendants.**

**Civil Action No. 00–1017(JR).**

United States District Court, District of Columbia.

Aug. 20, 2001.

Stephen E. Roady, Eric A. Bilsky, Monica B. Goldberg, Sylvia F. Liu, Washington, DC, Ocean Law Project, Earthjustice Legal Defense Fund, Washington, DC, Jack K. Sterne, Trustees for Alaska, Anchorage, AK, for Plaintiffs.

Allison V. Areias, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, Roger Eckert, NOAA, Office of the General Counsel, Silver Spring, MD, Robert Babson, NOAA, Office of the General Counsel, Juneau, AK, for Federal Defendants.

Robert G. Hayes, Ball Janik, LLP, Washington, DC, Scott L. Frederickson, Jeffrey W. Leppo, Beth S. Ginsberg, Stoel Rives LLP, Seattle, WA, for Defendants Alaska Oil and Gas Association, Inc. and Resource Development Council of Alaska, Inc.

Steve Silver, Robertson, Monagle & Eastaugh, P.C., Arlington Courthouse Plaza, Arlington, VA, for Defendants City of Anchorage, Matanuska–Susitna Borough and Kenai Peninsula Borough.

## MEMORANDUM

ROBERTSON, District Judge

This Administrative Procedure Act case presents a challenge to the decision of the Secretary of Commerce and the National Marine Fisheries Service (NMFS) to list the Cook Inlet Beluga Whale as "depleted" under the Marine Mammal Protection Act, but not as "endangered" or "threatened" under the Endangered Species Act (ESA). The Secretary determined that the recent Beluga Whale population decrease, which everyone agrees is attributable almost exclusively to over-hunting, can be arrested using the statutory protection afforded "depleted" marine mammal species and a legislative moratorium on Native American takings.[1] Because the plaintiffs have not sustained their burden of showing that that determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," summary judgment will be entered in favor of the government.

*Factual and Procedural Background*

The Cook Inlet Beluga Whale (Delphinapterus leucas) is a genetically distinct, geographically isolated marine mammal with a remnant population that inhabits Cook Inlet from late April or early May until October or November. NMFS estimates that in the mid–1980's, between 1000 and 1300 whales inhabited the inlet. Today, the population is estimated at between 300 and 400 whales. It is not disputed that the single most significant factor in the population decline has been Native American hunting: NMFS estimates that between 1995 and 1997 the Native American subsistence harvest averaged 77 whales per year. That is why, in March 1999, the plaintiffs filed a petition to list the Cook Inlet Beluga Whale under the Endangered Species Act (ESA).[2]

The Endangered Species Act delegates to the Secretary of Commerce the authority to determine whether fish, wildlife, or plant species should be listed as endangered or threatened. A species is "endangered" when it is in "danger of extinction throughout all or a significant part of its range," and it is "threatened" when it is "likely to become an endangered species within the foreseeable future." 16 U.S.C. §§ 1532(6), (20), 1533(c). The Secretary's ESA determination is made on the basis of five statutorily prescribed factors, any one of which is sufficient to support a listing determination. 16 U.S.C. 1533(a)(1).

Within thirty days of plaintiffs' request for an ESA listing, the NMFS published formal notice that action under the ESA "may be warranted." That notice triggered a one year status review period.[3]

---

1. A temporary legislative moratorium on Native American takings of Cook Inlet Beluga Whales was signed into law May 21, 1999. Pub.L. 106–31, § 3022, 113 Stat. 57, 100. The moratorium was made permanent in December, 2000. Pub.L. 106–553, § 1(a)(2), 114 Stat. 2762 (Dec. 21, 2000). Because the statute contains an exception for takings under a cooperative agreement between NMFS and the affected Alaska Native organizations, the protection it affords (or fails to afford) is co-extensive with that of the MMPA listing.

2. The naming of the Cook Inlet Beluga Whale itself as a plaintiff is acknowledged by the Court as a *beau geste*, but it has no legal significance. *Hawaiian Crow v. Lujan*, 906 F.Supp. 549, 551–53 (D.Hawai'i 1991).

3. Plaintiffs' complaint that defendants violated the ESA by waiting more than a year to make their final decision has been mooted by

On October 19, 1999, the NMFS published a proposed rule, not under the ESA, but under the Marine Mammal Protection Act (MMPA), to list the whale as "depleted." (The final rule was issued May 31, 2000). Under the MMPA, 16 U.S.C. § 1362, the Secretary can designate a species as "depleted" if the species is listed as endangered or threatened under the ESA or if the Secretary determines that the stock is below its Optimum Sustainable Population. Once a marine mammal has been listed as "depleted," the Secretary is authorized to promulgate regulations limiting takings by Native Americans, but a listing under the MMPA does not have the regulatory, economic and environmental fallout of a listing as "threatened" or "endangered" under the ESA.

On June 22, 2000, the NMFS determined that an ESA listing was "not warranted." It is that determination which, in plaintiffs' submission, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### Argument

■ "In exercising its narrowly defined duty under the APA, the Court must consider whether the agency acted within the scope of its legal authority, adequately explained its decision, based its decision on facts in the record, and considered the relevant factors ." *National Park and Conservation Ass'n v. Stanton*, 54 F.Supp.2d 7, 11 (D.D.C.1999). Plaintiffs argue that the agency decision in this case improperly applied the law and facts to the five-factor determination; failed to apply the best scientific and commercial data available; and improperly considered political and economic factors.

### I. Statutory Factors

A decision whether or not to list a species shall be made "solely on the basis of the best scientific and commercial data available ... after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation." 16 U.S.C. § 1533(b). Applying this standard, the Secretary must list a species as endangered or threatened if "any of § 1533(a)(1)'s five factors are sufficiently implicated." *Southwest Center for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C.Cir.2000). Each of the five factors is considered below.

*(A) The present or threatened destruction, modification, or curtailment of the species' habitat or range.*

■ The agency's conclusion that "no indication exists that the range has been, or is threatened with being modified or curtailed to an extent that appreciably diminishes the value of the habitat for both survival and recovery of the species," 65 Fed.Reg. 38778, 38781 (June 22, 2000), was not arbitrary or capricious. There is no dispute that the Cook Inlet, the whale's habitat, has changed over time in response to the increasing demand of municipal, industrial, and recreational activities, but there is no record basis for concluding that these changes have had a deleterious effect on the whale. Plaintiffs can point only to the fact that the whales have increasingly inhabited the upper inlet in recent decades. The agency concedes that this change in whale behavior might be in response to human activities, but no data suggest that the change threatens extinction. The agency is not required to conduct further testing to determine the effect of various environmental factors, such

the issuance of final agency action. *Natural Resources Defense Council v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 814 (D.C.Cir.1982).

as oil drilling, on the whale population. "The 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies." *Southwest Center for Biological Diversity,* 215 F.3d at 60.

### (B) Overutilization

All agree that Native American harvesting has been the most significant factor in the declining whale population. The agency has found "that a failure to restrict the subsistence harvest would likely cause CI beluga whales to become in danger of extinction in the foreseeable future." 65 Fed.Reg. 38778, 38783 (June 22, 2000). But the agency has also concluded that "overutilization" does not support ESA listing because it has been stopped—by designating the whale as "depleted" under the MMPA. Plaintiffs attack that conclusion as unreasonable.

■ Although plaintiffs are correct that the agency has used low population as evidence to support other listing decisions, NMFS is not required by law to list any species with a historically small or a declining population, and the NMFS decision in this case is not inconsistent with agency precedent. It seems clear that the agency *must* list under the ESA (1) if the current population qualifies as "threatened" or "endangered" without considering any further decline, *see, e.g., Friends of Wild Swan, Inc. v. U.S. Fish Wildlife Service,* 945 F.Supp. 1388, 1398 (D.Or.1996) (the agency "determines for listing decisions whether a species '*is* an endangered species'"); 65 Fed.Reg. 26167, 26171 (May 5, 2000) (listing white abalone where the population decline resulted in "extremely low" reproduction chances); 57 Fed.Reg. 47620, 47620 (Oct. 19, 1992) (ESA listing not warranted where "given present abundance estimates and levels of take, [ ] the population will remain viable in perpetuity"), or

(2) if the current population will continue to decline, even with the MMPA listing, to levels warranting listing, *see, e.g., Defenders of Wildlife v. Babbitt,* 958 F.Supp. 670 (D.D.C.1997) (requiring listing where lynx population not only had declined from its historic numbers, but was continuing to decline). But neither of those conditions has been shown to exist.

■ If the moratorium fails to control Native American harvesting in the future, ESA listing will be warranted. That much is agreed. But plaintiffs have been unable to point to anything in the record indicating that the current whale population is unsustainable if the harvest is indeed restricted successfully. Nor have plaintiffs successfully rebutted a study by Breiwick and DeMaster (1999), who examined the effects of stochastic events on the population dynamics of small populations of whales subject to subsistence harvests and reported no extinctions in populations with maximum environment stochasticity and a 3 percent harvest rate. 65 Fed.Reg. 38778, 38782–38783 (June 22, 2000). Plaintiffs disagree with Breiwick and DeMaster and cite to Dr. Lande (whose declaration was stricken as extra-record material) for the proposition that NMFS did not have the necessary data to model stochastic events. Even if Dr. Lande's opinions had been before the agency, however, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Whether the Breiwick and DeMaster study was an adequate model or not and whether its substitution of additional mortality for random events was reasonable or not are the sorts of agency decisions

courts will rely on unless "there is 'simply no rational relationship' between the model chosen and the situation to which it is applied." *American Iron & Steel Institute v. Environmental Protection Agency,* 115 F.3d 979, 1004 (D.C.Cir.1997).

Plaintiffs argue that harvesting will still occur even after the MMPA "depleted" listing because some hunting will be permitted under co-management agreements between the agency and Native American organizations and some hunting will occur illegally. Proposed regulations governing co-management agreements, however, limit Native American hunts to two strikes annually, 65 Fed.Reg. 59164, 59165–66 (Oct. 4, 2000), and there is no reason to believe that the MMPA's enforcement mechanisms, which are identical to those of the ESA, will be less effective in controlling illegal takings. Plaintiffs' concerns are reasonable, and enforcement should be carefully monitored, but the record contains support for the agency's conclusion that future takings will be minimal and that the current population is sustainable.

### (C) Disease or Predation

The agency concedes that both disease or predation "occur in the CI beluga population and may affect reproduction and survival," but it has concluded that these factors are not causing the stock to be threatened or endangered. 65 Fed.Reg. 38778, 38781 (June 22, 2000). Plaintiff has not shown that conclusion to be arbitrary or capricious. Nothing in the record indicates that disease threatens recovery of the Beluga Whale stocks. Plaintiffs have not rebutted the agency's finding that "[n]o quantitative data exist on the level of removals from this population due to killer whale predation or its impact." *Id.* "Even if the available scientific and commercial data were quite inconclusive, [the Secre-

tary] may—indeed must—still rely on it at that stage." *Southwest Center for Biological Diversity,* 215 F.3d at 60.

### (D) Inadequacy of Existing Regulatory Mechanisms

We have found nothing in the record, and plaintiff has identified nothing, showing that there are inadequacies in existing regulatory mechanisms or, if there were, what the effects of such inadequacies would be. Plaintiffs argue that the MMPA is inadequate to ensure that illegal hunting does not occur and to adequately protect Cook Inlet from damaging development activities, but that argument simply asserts plaintiffs' policy preference for a remedy under the ESA and begs the question of whether ESA listing is required.

### (E) Other Natural or Manmade Factors Affecting its Continued Existence

Plaintiffs argue that there are many other factors—strandings, oil spills, takings through commercial fishing, effects of pollutants, ship strikes, noise, urban runoff, etc.—that put the species at risk and that it was arbitrary and capricious for the agency to determine that "[t]he best available information … indicates that these activities, alone or cumulatively, have not caused the stock to be in danger of extinction and are not likely to do so in the foreseeable future." 65 Fed.Reg. 38778, 38783 (June 22, 2000). They point to a snippet in the record indicating that "other factors could be contributing to the decline," AR–D545, at ¶ 5, and argue that the agency failed to adequately consider the cumulative effects of all of the potential factors combined with the small population size of the Cook Inlet Beluga Whale.

It is true that the absence of "conclusive evidence" of a real threat to a

species does not justify an agency's finding that ESA listing is not warranted. *Defenders of Wildlife*, 958 F.Supp. at 679. But neither is listing required simply because the agency is unable to rule out factors that could contribute to a population decline. It was not arbitrary or capricious for the agency to place its principal reliance on the cessation of Native American hunts and the Breiwick and DeMaster conclusion that the Cook Inlet Beluga Whale population could sustain itself, even accounting for stochastic events.

## II. Other Arguments

### (A) IUCN Criteria

The agency's decision is not rendered arbitrary by the fact that criteria adopted by the International Union for the Conservation of Nature and Natural Resources (IUCN) would have supported a different conclusion. The IUCN criteria are widely used, by NMFS among others, to classify species that are at a high risk of extinction. But the agency's obligations arise under the five statutory criteria of the ESA, and not the IUCN criteria. The agency adequately explained its decision to depart from the IUCN recommendation in its final decision. 65 Fed.Reg. 38778, 38779 (June 22, 2000).

### (B) Political Considerations

Plaintiffs' allegation that the listing decision was impermissibly affected by political considerations is not supported by the record. The record does contain an agency memorandum reciting that the whales "presently meet some or all of the qualifications for listing under both the ESA and MMPA," and stating that one of the advantages of an MMPA listing is that "interest among the Alaska congressional delegation is high, which opposes an ESA listing." AR–D309 at 1–3. And, one of the agency's own experts stated that the evidence "towards a listing . . . are compelling" and that "most knowledgeable scientists would support a listing decision in the absence of politics." AR–F25 at 2. These bits of evidence show that the agency's decision was a difficult one and that political considerations may have been lurking in the corridors. They do not establish that, but for "politics," the whale would have been listed under the ESA or that political considerations became part of the decision making process.

An appropriate order accompanies this memorandum.

## ORDER

Upon consideration of the cross motions for summary judgment and of the whole record, it is this—day of August, 2001,

**ORDERED** that defendants' motion for summary judgment [# 32] is **granted.** It is

**FURTHER ORDERED** that plaintiffs' motion for summary judgment [# 30] is **denied.** And it is

**FURTHER ORDERED** that intervenors' motions for summary judgment [# 37, # 40] are **granted.**