THOMAS, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that the U.S. Fish and Wildlife Service (the “Service”) *1033 did not, in its delisting rule,[1] articulate a rational connection between the record data and its determination that whitebark pine declines were not likely to threaten the Yellowstone grizzly bear. Unlike the majority, I would hold that the agency also erred in concluding the Yellowstone grizzly is not threatened by “the inadequacy of regulatory mechanisms.” 16 U.S.C. § 1533(a)(1)(D) (“Factor D”).[2] Therefore, I would affirm the district court’s decision in its entirety.
I
The Service did not fulfill its regulatory responsibility in determining that existing regulatory mechanisms were sufficient to protect the Yellowstone grizzly. Not only did the Service rely on voluntary, rather than “regulatory,” measures, but it did not explain adequately how existing regulatory mechanisms actually prevent grizzly bear mortality. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Pac. Coast Fed’n of Fishermen's Ass’ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1091 (9th Cir.2005).
A
In response to dramatic grizzly bear population declines, the Service listed the grizzly as “threatened” under the Endangered Species Act in 1975. Since that time, the Service has repeatedly recognized the need for binding conservation measures that safeguard grizzlies from the threats which led to their decline. Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed.Reg. 31,734, 31,734 (July 23, 1975); 72 Fed.Reg. at 14,922.
In the Greater Yellowstone Area, where grizzly populations were in jeopardy, the need for binding conservation measures and mortality controls has remained paramount. See 72 Fed.Reg. at 14,868, 14,871, 14,922. As the Service explained in its brief:
Because the lack of adequate mortality and habitat standards contributed to the grizzly bears decline and ultimate listing, the Service and its State and federal partners spent over a decade developing the Conservation Strategy, which, among its other protections, imposes strict mortality limits and many legally enforceable habitat standards on its state and federal signatories.
(Emphasis added.)
In its Factor D determination, however, the Service relied on a number of voluntary, rather than “regulatory,” measures. Chief among these is the “Final Conservation Strategy for the Grizzly Bear in the Greater Yellowstone Area” (“Strategy”),[3] upon which the Service tells us it “largely based” its analysis.[4] Indeed, the Service *1034 lauds the Strategy’s “strict mortality limits” as one of its “key tenets.” But under the Rule, compliance with the Strategy is purely voluntary. See 72 Fed.Reg. at 14,-904 (“[T]he Strategy cannot legally compel any of the signatories to implement management policies or obligate funding.”). There is not a single federal or state law or regulation that provides a means for enforcing the Strategy’s mortality standards.[5] Id. at 14,922-26. Rather, if the grizzly population becomes threatened, the agency is to review the situation and call a committee meeting.[6] And that only occurs if the mortality limits are exceeded for at least two years. 72 Fed.Reg. at 14,925.
The Service’s reliance on voluntary action is contrary to law. The phrase “regulatory mechanism” plainly does not encompass voluntary, unenforceable measures such as the Strategy and many of its components. Or. Natural Res. Council v. Daley, 6 F.Supp.2d 1139, 1155 (D.Or.1998) (interpreting 16 U.S.C. § 1533(a)(1)(D) to mean that “the [agency] must base its decision on current, enforceable measures”). The Service therefore erred by considering the Strategy’s voluntary and unenforceable components in its Factor D determination. Good intentions are not rules of law. Unenforceable aspirational goals are not regulatory mechanisms. Promises to monitor, review, and convene committees do not satisfy the statutory requirement. See Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 72, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (noting that monitoring is not a legally binding commitment under the APA). Thus, the Rule must be vacated for non-compliance with 16 U.S.C. § 1533(a)(1)(D). See State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (“[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.... ”).
B
The Service’s analysis of existing laws and regulations is also flawed. Notably, the Rule does not explain how these measures prevent excessive grizzly bear mortality. Given the Service’s view that mortality control is “a key part of any successful management effort,” 72 Fed.Reg. at 14,-871; see also Strategy, supra note 3, at 31, its failure to account for regulatory mechanisms addressing mortality renders the Rule arbitrary and capricious. See State Farm, 463 U.S. at 43,103 S.Ct. 2856 (“[A]n agency rule would be arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem.”).
Citing to the Strategy, the Rule refers to 40 “Federal laws, rules, guidelines, strategies, and reports and 33 State laws, *1035 statutes, and regulations” applicable to management of the Yellowstone grizzly population. 72 Fed.Reg. at 14,922-23. The list sounds impressive, but the Rule is silent as to how these measures actually protect the grizzly. In fact, the vast majority of the cited laws and regulations predate the original listing and thus failed to protect the grizzly 35 years ago. The Service does not explain why these old laws now offer sufficient protection, despite the fact that the Service is required to consider the same factors in delisting as when listing. 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(d).
Moreover, most of the listed laws and regulations do not specifically relate to grizzly protection; rather, they involve generic environmental and resource management. For example, one does not often think of a federal act establishing a highway between national parks as a statute aimed at protecting the grizzly, and yet this law is among those cited by the Strategy.[7] So is the Sikes Act of 1960, which provides for cooperative resource management on military reservations.[8]
The listed state laws and regulations provide no more comfort. These provisions do not require the states to control grizzly mortality in accordance with the Strategy, and they only apply outside of the Primary Conservation Area. Further, the cited state laws do not necessarily protect the grizzly. Indeed, most of the statutes cited are laws that allow the killing of bears. For example, Wyoming statutes define a grizzly bear as a “[t]rophy game animal,” Wyo. Stat. Ann. § 23-1-101(a)(xii)(A), and require a hunting license, id. at § 23-3-102(b). The Wyoming Grizzly Bear Management Plan allows regulated hunting of grizzlies. It also flatly states that it will not allow grizzlies to reoccupy certain mountain ranges, and that it will enforce that policy through sport hunting and removal.[9] Idaho’s Grizzly Bear Management Plan similarly recognizes the grizzly as a “game animal” and further acknowledges that a large portion of potential grizzly habitat is beyond the reach of state law because it is located on the Shoshone-Bannock reservation, which is governed by tribal law.[10] The Tribe has not spoken on how it intends to proceed.[11] *1036 The Montana plan also allows regulated hunting of grizzlies and states that “[Regulated harvest will be a part of Montana’s long-term conservation plan.[12]
Neither the Rule nor the Strategy adequately explains how these 70-odd federal and state laws and regulations will affect the Yellowstone grizzly. The only reference is contained in Appendix J to the Strategy,[13] where a simple grid lists each federal and state provision and an “X” beside the provisions that purport to address Factor D. There is no explanation or rationale provided. It is difficult to imagine a less illuminating document.
Merely compiling a list of potentially applicable statutes and regulations is not sufficient; the agency must explain why these laws and regulations constitute adequate regulatory mechanisms for grizzly protection. In short, the Service has not met its obligation to “articulate a satisfactory explanation” for its determination that adequate regulatory mechanisms exist to protect the Yellowstone grizzly. State Farm, 463 U.S. at 43, 103 S.Ct. 2856; Ctr. for Biological Diversity v. U.S. Dep’t of Interior, 623 F.3d 633, 648 (9th Cir.2010) (noting that this circuit has “insisted that agencies support and explain their conclusions with evidence and reasoned analysis”).
C
In sum, the district court correctly determined that the Rule did not comply with 16 U.S.C. § 1533(a)(1)(D). As a matter of law, unenforceable, voluntary promises do not constitute “regulatory mechanisms.” Mere citation to potentially applicable statutes and regulations without analysis does not fulfill the Service’s obligation to explain how they act as adequate regulatory mechanisms for protection of the grizzly Neither the Rule nor the Strategy provide a legally enforceable method by which the Service can impose its mortality limits. The district court was right to reject the Service’s Factor D analysis.
II
I do not question, much less criticize, the enormous effort that the Service, the states, and interest groups have made to study and manage the Yellowstone grizzly. However, our task is not to assess those endeavors from a policy viewpoint; it is to apply the law as Congress has directed. In doing so, I reach the same conclusions as the district court. To the extent my colleagues hold otherwise, I respectfully dissent.

. Final Rule Removing the Yellowstone Distinct Population Segment of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife. 72 Fed.Reg. 14,866 (Mar. 29, 2007) ("Rule”).

. The whitebark pine holding suffices to affirm the district court’s judgment vacating the Rule. Greater Yellowstone Coal., Inc. v. Servheen, 672 F.Supp.2d 1105 (D.Mont.2009). Therefore, it is unnecessary to assess the Service's Factor D analysis. However, because the majority has opined on the issue, I will as well.

. Interagency Conservation Strategy Team, Final Conservation Strategy for the Grizzly Bear in the Greater Yellowstone Area (Mar. 2007) available at http://www.fws.gov/ mountain-prairie/species/mammals/grizzly/ yellowstone.htm.

. Because the Service offered the Strategy as a primary basis for its Factor D determination, “we cannot readily say” that this error *1034 “clearly had no bearing on the Secretary’s ultimate decision” to delist. Tucson Herpetological Soc’y v. Salazar, 566 F.3d 870, 880 (9th Cir.2009).

. The Service claims the incorporation of the Strategy’s standards into National Forest Plans and National Park Superintendent's Compendia afford the Strategy the force of law. But the National Forest Plans only incorporate the Strategy’s habitat standards and contain no mechanism to enforce mortality limits.

. More specifically, when a deviation from the Strategy's mortality standards occurs, it triggers a non-binding “Biological and Monitoring Review,” to be completed and made public within six months of initiation. 72 Fed.Reg. at 14,925. Then, the "multi-agency Yellowstone Grizzly Coordinating Committee” responds to the Review, and "if the desired population and habitat standards specified in the Strategy cannot be met ... the Coordinating Committee will petition [the Service] for relisting.” Id. However, as the majority also recognizes, the “suggestion” of a future relisting does not “operate as a reasonable justification for delisting.”

. See Appendix J in Strategy, supra note 3, at 157 (referencing Act to Establish John D. Rockefeller, Jr., Memorial Parkway, Pub.L. No. 92-404, 86 Stat. 619, 619 (1972)).

. Id. (referencing Sikes Act of 1960, 16 U.S.C. § 670a). The other federal statutes cited in the Strategy are similarly tangential or generic: Yellowstone National Park Act of 1872, ch. 24, § 1, 17 Stat. 32, 32-33 (1872); National Park Service Organic Act of 1916, 16 U.S.C. § 1; Lacey Act of 1900, 16 U.S.C. § 701; Fish & Wildlife Coordination Act of 1934, 16 U.S.C. §§ 551-664; Grand Teton National Park Expansion Act of 1950, 16 U.S.C. § 406d-l; Multiple-Use Sustained-Yield Act of 1960, Pub.L. No. 86-517, 74 Stat. 215 (codified as amended in scattered sections of 16 U.S.C.); National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370; Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1536; Forest and Rangeland Renewable Resources Planning Act of 1974, Pub.L. 93-378, 88 Stat. 476 (codified as amended in scattered sections of 16. U.S.C.); National Forest Management Act of 1976, Pub.L. No. 94-588, 90 Stat. 2949 (codified as amended in scattered sections of 16 U.S.C.); Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-1787; Fish & Wildlife Improvement Act of 1978, 16 U.S.C. § 742; and Fish and Wildlife Conservation Act of 1980, 16 U.S.C. §§ 2901-2911.

. Wyoming Game and Fish Department, Wyoming Grizzly Bear Management Plan 15 (Feb. 2002, as amended, July, 2005).

. Idaho’s Yellowstone Grizzly Bear Delisting Advisory Team, State of Idaho Yellowstone Grizzly Bear Management Plan 18 (Mar.2002).

. The Idaho Management Plan states: "The hunting of grizzly bears by members of the Shoshone-Bannock Tribes is a traditional and *1036 cultural issue, which will be determined by the Governing Body of the Shoshone-Bannock Tribal Council after delisting of the grizzly bear is finalized.” Id.

. Montana Department of Fish, Wildlife & Parks, Grizzly Bear Management Plan for Southwestern Montana 2002-2012 56 (Oct. 2002).

. Appendix J is entitled "The Relationship Between the Five Factors in Section 4(a)(1) of the ESA and the Existing Laws and Authorities.”